G. W. BARKSDALE v. E. D. MARCUM et ux.

Middle Section.   March 24, 1928.

Petition for Certiorari denied by Supreme Court, July 14, 1928.

698

C. J. Cullom, of Livingston, and W. G. Sidwell, of Celina, for appellant.

E. C. Knight, of Livingston, for appellee.

FAW, P. J. On the final hearing of this cause in the chancery court, the complainant's bill was dismissed, and the complainant, G. W. Barksdale, has brought the case, by appeal, to this court, and has assigned errors here.

An appeal in a chancery case, tried according to the forms of the chancery court, vacates the decree appealed from, and opens the whole case, on the pleadings and evidence, for a trial de novo in the appellate court, of the whole matter of law and fact appearing in the record. Shan. Code, Sec. 4887; Willis and Turner v. Moore and Daves, 151 Tenn., 562, 271 S. W., 736.

But where issues of fact in chancery are tried by jury, upon the demand of either party, errors in the proceedings can only be corrected as errors are corrected in actions at law. Shan. Code,

Sec. 4888. And in such cases the finding of the jury has the same force and effect as in a trial at law. Shan. Code, Sec. 6286.

It is also an established rule that where, by consent of the parties, the case is tried by the Chancellor sitting as a jury, after a jury has been demanded and granted, the Chancellor's findings have the same weight as the verdict of a jury rendered on a proper charge. Toomey v. Atyoe, 95 Tenn., 373, 32 S. W., 253; Beatty v. Schenk, 127 Tenn., 63, 152 S. W., 1033; Choate v. Sewell, 142 Tenn., 487, 221 S. W., 190; Boshears v. Foster, 154 Tenn., 494, 498, 290 S. W., 387.

In the present case, there is a controversy between the parties as to whether or not, on the final hearing, the Chancellor was sitting as a jury. A jury was demanded by the defendants and there was a trial by jury in August, 1925, when the jury found the issues in favor of the defendants. This verdict was set aside by the Chancellor for reasons not disclosed by the record, and the issues were submitted to another jury at the August term, 1926; but the jury failed to agree, and a mistrial was entered.

At the February term, 1927 (on February 7th), a decretal order was entered in these words:.

> "When this cause was regularly reached on the docket for trial, it was announced that the actual jury heretofore demanded by the defendants, by agreement of the parties is waived and that the case may be prepared by the further taking of the proof that either party may desire, the said taking to be on Tuesday, February 8, 1927, at the law office of C. J. Cullom, in Livingston, Tennessee, and continue from day to day until completed and either party may have present any witnesses they desire to take, and this order will be sufficient notice to both parties for the taking of such proof, and after the proof has been completed, a hearing may be had at the chambers of the Chancellor in Livingston, Tennessee, at a convenient time for the court and both parties, which is fixed for Friday, February the 11th, 1927, and said trial to begin at nine o'clock a. m., on that date."

No further order appears until the final decree, which contain the following recitals:

> "This cause came on again to be heard before the Honorable W. R. Officer, Chancellor, on this February 26, 1927, upon the entire record in the cause, the actual jury being waived, and the cause prepared in the ordinary way, by deposition, and it being a record case, and tried on this date at chambers, as per former orders in the cause at the last regular term of this court, when, after due consideration of the bill, the answer

thereto, and entire record, the court was of opinion and so orders, adjudges and decrees as follows:" ·

(Then follows the decree of the court).

The Chancellor also filed a "Memorandum Opinion" setting forth his findings of fact and law.

The case was heard by the Chancellor on the pleadings and written depositions, with documentary exhibits, alone. In other words, it was heard altogether "according to the forms of chancery practice." If the decree had contained nothing bearing upon the question now under consideration except the statement that "the actual jury" was waived, there might be room for an implication that the Chancellor was sitting as a jury; but such implication is repelled by the recitals in the context that the cause was "prepared in the ordinary way, by depositions," and that it was "a record case."

We are of the opinion that the appellant is entitled to a re-examination by this court "of the whole matter of law and fact appearing in the record," limited, however, by our printed rules which require assignments specifically pointing out the errors of which the appellant complains. 151 Tenn., p. 815; Wood v. Frazier, 86 Tenn., 500, 8 S. W., 148.

The purpose of complainant's bill is to recover certain alleged overpayments of rentals for an oil and gas lease, aggregating (according to complainant's amended bill) $476, which lease was made by defendants to complainant on November 24, 1919.

The aforesaid lease is in evidence, and is, in part, as follows:

"Agreement, made and entered into this, the 24th day of November, A. D. 1919, by and between E. D. Marcum and wife, Martha Marcum (of Willow Grove, Clay county, Tennessee) parties of the first part, and of the county of Clay and State of Tennessee, and G. W. Barksdale, of Celina, Clay county, Tennessee, parties of the second part, Witnesseth, That the said parties of the first part, for and in consideration of the sum of $1 in hand well and truly paid by the said party of the second part, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained on the part of the party of the second part to be paid and performed, have granted, demised, leased and let, and by these presents do grant, demise, lease and let unto the second party, its successors and assigns, for the sole and only purpose of drilling and operating for oil and gas, selling oil and gas, and laying pipe lines, constructing tanks, buildings, and other structures thereon to take care of said products, all that certain tract of land situated in the county of Clay and State of Tennessee, and described as follows, to-wit:

"Bounded on the north by the lands of J. R. McCluskey; bounded on the east by the lands of W. E. Hargrove and Jas. Wadkins; bounded on the south by the lands of J. W. Arnold and Joe Holman; bounded on the west by the lands of Jno. J. Hargrove and Tom Johnson and Irons Creek, containing 2000 acres, more or less, being the same land conveyed to parties of the first part by Tom Hill and others on day of 191—, in Deed Book P, page —— county clerk's office, and comprising all of the tract of land so conveyed to first party.

"It is agreed that this lease shall remain in force for the term of ten years from this date, and as long thereafter as oil or gas, or either of them, is produced therefrom by the party of the second part, its successors or assigns, unless surrendered by second party.

"In consideration of the premises, the said party of the second part covenants and agrees: First to deliver to the credit of the first part, their heirs or assigns, free of cost in the pipeline to which he may connect his wells, the equal one-eighth part of all the oil produced and saved from the leased premises.

"Second—To pay to the first parties one hundred dollars ($100) each year in advance, for the gas from each well where gas only is found, while the same is being marketed off the premises and the parties of the first part to have free gas free of cost to heat and light one dwelling house on said premises during said time.

"The party of the second part agrees to drill and complete a well on said premises within twenty-six days from the date hereof, or pay in advance at the rate of ten cents an acre per year payable quarterly for each additional year such completion is delayed from the time above mentioned for the drilling and completion of such well, until a well is completed. The above rental shall be paid to the party of the first part in person or by check to his order, deposited in the Post Office by registered letter to his address at Willow Grove, Tennessee, or deposited to their credit in Bank of Celina, Celina, Tennessee, and it is further agreed by parties of the first part that the completion of a well on and in the leased territory shall be, and operate as a full liquidation of all rental under this provision during the remainder of the term of this lease.

. . . . . . . . . .

"It is agreed that unless said well is completed or the rental paid as hereinbefore stipulated, this lease shall be and becomes null and void and of no further effect at the option of the lessor.

"It is agreed that second party may surrender this lease and thereby render it null and void at any time by payment of $1 to first parties, their heirs or assigns."

Complainant made sixteen quarterly payments of $50 each, as rentals under the terms of said lease, Before another payment became due, an oil well was drilled and completed on the leased premises (in June, 1923) by an assignee of the complainant, and, by the terms of the lease, the liability of the lessee for money rentals thereupon ceased.

Shortly after complainant made the last of the quarterly payments above mentioned, he learned, from a survey made by the procurement of his assignee, that the tract of land described in the lease contained only 810 acres. The rentals paid by him as aforesaid had been computed on the basis of 2000 acres at ten cents an acre per year. Complainant made demand of defendant E. D. Marcum for the repayment of the rentals paid in excess of ten cents an acre per year on 810 acres, which demand was refused, and thereupon complainant brought this suit.

In his bill complainant alleged that he knew nothing of the number of acres or the boundary lines of the lands of the defendants; that he took said lease upon the representations made, to him by defendant E. D. Marcum that the tract contained 2000 acres, and that he paid the rentals fully believing that there was substantially that number of acres in the tract. Complainant charges in his bill that in leasing the land to him as containing 2000 acres, when it contained only 810 acres, the defendants perpetrated a fraud on complainant, and that, if the shortage was unknown to defendants, it was such a mistake as a court of equity will correct, etc.

The original bill was filed on December 4, 1923, and therein complainant alleged that the leased tract contained 804 acres by survey. On March 15, 1924, complainant filed an "amended and supplemental bill" by which he amended his pleadings so as to aver that there was a total of 810 acres of the leased lands, and that he made sixteen overpayments of $29.75 each to defendants, for which, with interest, he sues.

In his amended and supplemental bill complainant also amplifies his charges of fraud and mistake, and again, by another "amended and supplemental bill" filed on February 22, 1926, complainant further amplified his charges of fraud on the part of defendants and mistake on his own part, and further alleged that if defendants did not know that said lands contained much less than 2000 acres, the insertion of 2000 acres in the lease was a mutual mistake for which complainant is entitled to the relief sought.

The defendants demurred to the bills, but the demurrer was overruled, and the action of the Chancellor in that respect is not now questioned.

In their answer, defendants admitted that they executed the instrument described in complainant's bill and exhibited therewith, but defendants describe same as a "license contract," and defendants deny that they represented said tract of land to contain 2000 acres, and they aver that "it was expressly stated that it was believed that the tract of land did not contain 2000 acres," and further, that the phrase "2000 acres, more or less" was used in the contract for the purpose of designating the amount of rental per year, payable quarterly—that is, $200 per annum or $50 per quarter, payable in advance—and for no other purpose.

The defendants aver that the phrase "containing 2000 acres" etc., was inserted in said contract by fraud, deceit and misrepresentation upon the part of the complainant, without fault upon the part of the defendants, or it was inserted by accident, oversight or mistake, unmixed with negligence on the part of the defendants.

It is further averred in defendants' answer that the complainant was not compelled to pay the sums for which he is suing, as he had full knowledge of such facts as should have put him on notice or given him full knowledge, and he voluntarily paid in order to extend his license for the operation of said premises for oil and gas and to obtain large benefits and profits and privileges by reason of holding said license or lease for that purpose.

Defendants further aver that on account of the voluntary payment by complainant of this $50 per quarter, in advance, or $200 annually, for the privilege of extending said license, the complainant, having such knowledge as should have put him on notice, voluntarily made said payments, he being satisfied to pay said sums for the privilege of such extensions without a survey to ascertain the number of acres; that holding said "license or lease contract" over defendants' land, and thus preventing defendants from leasing to or licensing others to enter upon said land to drill for oil and gas (which they otherwise could and would have done at several hundred per cent more than they were receiving from the complainant), and by his long delay in making a survey, his negligence, etc., complainant has been guilty of such laches as that, in equity, he is now estopped to assert any claim for the recovery of any part of said amount paid to defendants for the privilege of extending said lease or license, and which laches defendants plead as a bar of complainant's right to a recovery in this case.

Defendants further aver, on information, that complainant, by virtue of a sale of his interest in said license contract, has made large sums of money; that complainant has sold his interest therein "at large and almost unheard of profits;" that if the contract is to be reformed by complainant, it should be reformed as to de-

fendants, and the complainant required to pay over to defendants the large amount of money which he has realized on account of the aforesaid license contract; and defendants further aver that on account of these latter facts, "the complainant is now estopped from a recovery against the defendants."

The defendants filed their answer as a cross-bill, praying. that the "license contract" be reformed "so as to show the true facts, that is, so that the expression '2000 acres' be modified, changed and reformed so as to show that no number of acres was agreed upon at the time the contract was signed, either orally or in writing, extemporaneous or otherwise, and that the phrase '2000 acres, more or less' was inserted in said lease by cross-defendant for the purposes stated or set out in the body of this answer."

Defendants seem to have abandoned their cross-bill below, as, so far as appears, it was ignored by the Chancellor in his opinion and decree, and no question concerning it is raised in this court.

The Chancellor incorporated in his "Memorandum Opinion" a "Finding of the Facts," which is as follows:

"The facts are few. The lease is an ordinary form of Oil and Gas Lease in use by speculators and operators in this section. It contains no covenants; it is simply a license to complainant to enter upon the lands of defendant and prospect for oil. At the time it was executed it was written and prepared by complainant and there was nothing said about the number of acres in the tract leased. The same land in two separate tracts had been leased by defendant to complainant something like a year before, but failure to pay rentals had caused the former lease to lapse or become forfeited. At the time the two former leases were executed, the same lands were put in as two tracts of 600 acres and 1400 acres, and in writing the lease in controversy, complainant assumed that there was such quantity and wrote in the acreage.

"There was no fraud or misrepresentation by Marcum as an inducement to complainant Barksdale. The lease was obtained by complainant at his own solicitation, without any expectation of operating or drilling it himself, but as a speculation. He was speculating in leases, and endeavoring to bring about development of this section as an Oil Field in that way but had no intention of drilling himself.

"Marcum understood at the time that he was to get $200 per annum for the rentals for delayed operations, or $50 per quarter year in advance. The lands were well known in a general way to complainant who had been well acquainted in that section for many years. Marcum thought there was not the amount of acreage, and testifies that he told Barksdale

that there was not that amount of the land, but Barksdale denies that this statement was made by Marcum when the former lease was given and relied upon that. There was nothing in the way of an inspection of the land at the time, and the quantity to an exact figure was not deemed important by either at that time. I am sure neither thought the land would fall short more than half the estimated quantity, but both thought the quantity would approximate the amount stated, and there being no covenants in the lease, the importance of the named quantity in the deed was more for description as a basis for payment of rentals, if operations were not begun.

"I conclude and find that there was simply a mutual mistake as to quantity on the part of complainant and defendant, without any intention to deceive or mislead upon the part of either. If the quantity was deemed very material at that time a survey, or perhaps a careful inspection of the land, would have obviated any of this trouble that has come since.

"When the time for payment of rentals arrived, complainant made the payments upon the basis of 2000 acres, and if under the law and the facts he is entitled to recovery in this cause, the statement filed by and the amount testified to by him would fix the basis of his claim or judgment.

"Complainant continued to make the rental payments on said basis until the lands were actually surveyed and drilled for oil under the provisions of the lease by assignees of an interest in the lease."

Upon the foregoing facts found by him (and some additional facts stated later by him), the Chancellor rendered the following opinion:

"The case presents some difficulty to the court, in that an investigation of all available authorities discloses no decided case resembling this case. There is absolutely no precedent for the decision of this case. At least none has been found and none has been cited. The rule of decision in cases involving rights of vendors and purchasers does not apply, I think, where damages for deficiency of quantity in sale by the acre and sales in gross are allowed. In such cases abatement of purchase price or compensation for deficiency in quantity are allowed upon the theory that the covenants of warranty of title are broken when a great deficiency in sales in gross develops. In the lease there are no covenants. If complainant can recover I think it must be upon the equitable ground of mistake. Money paid under a mistake of fact may sometimes be recovered in an action in the nature of assumpsit. Now

the question is, was there such a mistake in the instant case, as that recovery will be allowed.

"The rule is, I think, that money paid under a mistake of fact, may be recovered where the mistake could not have been reasonably avoided had the complaining party exercised reasonable caution and that due diligence that an ordinary and prudent business man would naturally exercise. The mistake on the part of the complainant must be unmixed with negligence upon his part and such mistake as an ordinarily prudent and careful business man, could not have well guarded himself against. Now in this case there are no covenants, and a proper construction of the lease would be that the moving consideration in its execution on the part of both parties, was development of oil territory. The lessee ostensibly proposing to bear the great expense and risk of large sums for development with the provision for large profits, seven-eighths of the oil found, if oil is found, while the lessor, takes one-eighth without any risk of present outlay. A provision for a very nominal per acre rental (ten cents) per annum in case operation is delayed. The lessee would naturally expect to drill within the time allowed and no rentals accrue.

"In the case at bar, complainant pays the rental upon the basis fixed by the lease, ten cents per acre on 2000 acres, without even a casual inspection of the land. Any man of intelligence ought by a casual inspection of a boundary of land, to note the difference in 2000 acres and less than 800 acres, or at least have sufficient judgment about area to cause suspicion that possibly the whole area might not be there. A cheap method available anywhere to determine the exact area would be by survey.

"In the case at bar, a survey before the payments, would have avoided all this controversy. There was no obligation in this lease on the lessee to pay the ten cents per acre, that being, as I construe the lease, optional with him. Lessor could not have enforced the payment, his only remedy was a forfeiture of the lease. The payment was voluntarily made by lessee when he was under no legal or moral obligation to pay one cent. It was of the amount lessor understood he was to receive, $50 per quarter. If the lessee was not willing to and did not accept the provision in the lease as fixing the amount, he could have caused a survey to be made, and tendered the amount of ten cents per acre upon the exact acreage. If lessor did not accept this amount then at once the issue would have developed as to what the contract was. The lease could have then been construed, the contract determined, or the lease cancelled if the parties did not desire to continue it upon the basis found.

"In other words, if lessor understood he was to have $200 per annum, aside from what the actual survey would show the acreage to be, lessee was under no moral obligation to pay this or any other amount, and could permit the lease to lapse without any payment.

"Whether exactly material to the points to be decided, it may also be mentioned that complainant, the proof develops, has made large profits from sales of portions of this lease, some of the transfers in evidence indicating that a value of as much as $6.00⅔ per acre was fixed as the value of the lease. This case being decided upon its own facts and its peculiar equities, especially in the absence of precedent, the court deems the above facts of some materiality in arriving at his decision. The facts are also looked to, as shown by the proof, that defendant is an ordinary farmer, and that complainant is a shrewd business man of much experience and was using the property of lessor solely for the speculative purposes with the hope of yielding to him large profits, beside which the sum of ten cents per acre was a mere pittance and purely nominal as a consideration, and that the contract involved was drawn by complainant, and all of its terms written in by him.

"There is no binding covenant in the lease. If Marcum was guilty of any fraud or deceit as to the quantity of the land, it was at a different time and place from the preparation and execution of this lease, and something like a year before its execution. His complete acquaintance with the lands and in that community, and ownership of leases on adjoining lands to this, gave him almost, if not quite, an equal opportunity with lessor to know the quantity of this land. He was a man of wide business experience and acumen. He made this payment not even upon demand, but voluntarily, when not legally or morally obligated. He did not even protest its payment at the time, and took no steps whatever to ascertain the exact amount due, if the stipulation in the lease was not intended to govern absolutely as lessor seems to understand. I do not think it is such a mistake of fact as equity will compel repayment or grant relief. If a loss must fall upon complainant, it is not the result of any actionable wrong ex contractu or ex delicto on the part of defendant, but rather the result of his failure to use ordinary care and prudence in ascertaining the amount he was required to pay. Ordinary care and prudence would certainly have prevented a mistake of more than 1000 acres in a boundary of about 800 acres.

"The bill will have to be dismissed.

"W. R. Officer, Chancellor."

We are of the opinion that the learned Chancellor erred in adjudging that the instrument in question was "simply a license to complainant to enter upon the lands of defendant and prospect for oil." A "license," with respect to real estate, is an authority to do a particular act or series of acts on another's land without possessing any estate therein. It is not assignable, and is generally revocable at the will of the licensor. Words and Phrases Judicially Defined, Vol. 5, p. 4133.

As we construe it, the instrument here involved was an assignable lease and was not revocable at the will of the lessor. It is, in its essential features, of the same character as the oil and gas lease construed by our Supreme Court (speaking through Mr. Chief Justice Green) in the recent case (November 21, 1927) of Morris v. Messer, 156 Tenn., 54, 299 S. W., 782. In that case the court upheld the lease, and approved, as correctly defining the rights of the parties, a statement of the law found in 40 Corpus Juris, at page 1071, as follows:

> "Such a lease substantially gives the lessee an option to enter upon the property and begin drilling within the stipulated period, which option may be renewed from time to time by the payment of the stipulated rent, and likewise gives him the privilege of terminating the lease at any time; but it does not create a tenancy at will terminable at the option of the lessor."

It is due the learned and able Chancellor to say that the opinion in Morris v. Messer, supra (which was announced since the Chancellor's decree in the case at bar), is the first utterance of our Supreme Court on the question there decided, and. as appears from that opinion, there are numerous precedents in adjudged cases from other jurisdictions for the Chancellor's ruling that the instrument here in question was "simply a license," etc. However, the Supreme Court accepted the contrary view, sustained by ample authority, as the sounder rule, and, of course, there is no occasion for us to discuss other authorities.

The Chancellor's finding that the lease contract was "simply a license to complainant to enter upon. the lands of defendant and prospect for oil," is the basis of complainant's second assignment of error, and that assignment is sustained.

As stated in the Chancellor's findings, supra, complainant prepared the lease of November 24, 1919, here in question, in the presence of defendant E. D. Marcum, and therein described the leased land as containing 2000 acres, more or less. Defendant Marcum gave complainant the general boundaries (by naming the adjoining landowners) but there was no discussion at that time concerning the number of acres in the tract. This is explained by the fact that during the next preceding year (1918) the defend-

ants had made two oil and gas leases to complainant which, when combined, covered the same lands as the one lease now in question. Complainant testifies that when the two leases were made in 1918, defendant E. D. Marcum represented that one of the tracts contained 600 acres and the other tract contained 1400 acres, and in this statement the complainant is fully supported by the witness A. D. Rich. It is an undisputed fact, which both parties fully understood at the time, that the lease of November 24, 1919, covered both of the tracts included in the two leases of 1918; hence, complainant simply added the two tracts and described the land in the later lease as containing "2000 acres, more or less."

The testimony of complainant with respect to the representations of defendant Marcum finds further corroboration in the testimony of C. H. Upper, which we quote in full as follows:

"Q. State your age, residence and occupation? A. Age 42, residence, Memphis, Tennessee, occupation, oil.

"Q. Are you acquainted with complainant, G. W. Barksdale, and defendant E. D. Marcum, in this case? A. Yes.

"Q. Were you interested in the West Tennessee Oil Field in 1922 and 1923? If so for what company and in what capacity? A. I was Vice-President and Field Manager for the Producers Pipe Line and Refining Company and acted as their Field Manager.

"Q. When did you first visit Willow Grove in East Clay county, Tennessee, at whose instance did you go there and for what purpose? A. I went there in December, 1922, at the suggestion of Mr. G. W. Barksdale, to inspect the property of E. D. Marcum, to determine the advisability of our company drilling for oil on this property.

"Q. Did you meet and talk with E. D. Marcum on this trip and look over his land? A. Yes.

"Q. Did you and your company thru you later acquire this acreage at Willow Grove on which you drilled or caused to be drilled a well for oil? A. We acquired a portion of the Marcum lease on which we caused to have drilled a well.

"Q. From whom did you acquire this acreage and on what terms and how many acres of land was called for by the lease involving the transaction? A. We acquired the lease from G. W. Barksdale, the terms in substance were that we were to secure an assignment of one-half of the Marcum lease, said one-half supposed to contain approximately 1000 acres for the drilling of one well. 2000 acres was called for by the lease from Marcum to Barksdale.

"Q. In whose name was this original 2000 acre lease drawn and who was the owner of the land contained in the lease? A.

The original lease was drawn from E. D. Marcum to G. W. Barksdale, and E. D. Marcum was the owner of the land.

"Q. Did you go to Willow Grove again in April, 1923? A. Yes.

"Q. Did you on this trip make a selection of the land for your company on which the well was to be drilled in accordance with your agreement with Barksdale? A. Yes.

"Q. Who acted as guide and showed you over the land? A. G. W. Barksdale and E. D. Marcum.

"Q. Did you on these two trips talk with E. D. Marcum about the number of acres of his land? If so, please state what he said? A. I asked Mr. Marcum how many acres of land he owned in this tract and he informed me that it was approximately 2000 acres, it might run a little more or a little less.

"Q. Did he tell you that his various tracts of land contained less than 2000 acres. A. No.

"Q. Did he understand what you were there for on this last trip and the terms of the agreement you had with Barksdale to drill a well on his land? A. Yes, I explained to Mr. Marcum that our agreement with Mr. Barksdale was to receive 1000 acres for the drilling of this well, and that I would like to make a location at this time. Mr. Marcum accompanied me while I was making the location.

"Q. Were you frequently there after this trip and before the land was surveyed, and did you talk with him about the division of the lease and the number of acres it contained? A. Yes.

"Q. Did he on any of these occasions say anything that would lead you to believe that he had much less than 2000 acres of land and that the number of acres called for in the lease was greatly in excess of the number of acres of his land? A. No.

"Q. Did he point out any of his land and tell you it was not covered by the Barksdale lease? A. No.

"Q. Did you understand that the lease called for all of his land at or near Willow Grove? A. Yes.

"Q. When and by whom was your attention first called to probability that there was a large shortage in the acreage of this lease? A. My attention was called by G. W. Barksdale at Celina, I think about a month after this trip.

"Q. On what did Barksdale base his apprehension of this shortage? A. By scaling a geological map furnished by the United States Geological Survey.

"Q. Was this before or after you had completed the arrangements for the drilling of the well? A. This was after.

"Q. What results were had when the well was drilled? A. A good well was drilled in.

"Q. Who did you employ to make survey of and divide this lease? A. We employed Thurman H. Myers.

"Q. Is he an engineer and capable surveyor, and an honest, conscientious man? A. Yes, he is employed by a great many of the oil companies operating in this district.

"Q. Did you accept his survey as accurate. A. Yes.

"Q. Have you any interest in this lawsuit or are you in any way interested in the result of the trial of this case? A. No."

We do not think the proof supports the testimony of defendant E. D. Marcum that he told complainant that there was not 2000 acres in the tract. We find the weight of the evidence to the contrary.

It is doubtless true, as found by the Chancellor, that "Marcum understood at the time that he was to get $200 per annum for the rentals for delayed operations, or $50 per quarter in advance;" but we think that this understanding had its origin, or basis, in the fact that 2000 acres at the agreed rental price of ten cents per acre amounted to $200.

It is not easy to understand how defendant E. D. Marcum (knowing the boundaries of his lands and living upon them) could have reasonably supposed that his boundary contained 2000 acres, when it contained only 810 acres. It would seem that such a great discrepancy would have been apparent to a practical and experienced farmer and landowner such as defendant Marcum appears to be. But such a mistake is possible, and, in the absence of proof sufficient to establish wilful misrepresentation, an honest intent will always be presumed. We therefore concur in the Chancellor's finding that "there was simply a mutual mistake as to quantity on the part of complainant and defendant, without any intention to deceive or mislead upon the part of either." And, as a consequence of this concurrence, we overrule the complainant's third assignment of error, through which he asserts that the Chancellor erred in finding that there was no fraudulent misrepresentation made by defendant E. D. Marcum to complainant.

It remains to be determined whether (upon the finding that defendant E. D. Marcum innocently misrepresented to complainant that the leased tract of land contained 2000 acres, when it contained only 810 acres, and that there was a mutual mistake as to the number of acres on the part of complainant and defendant) complainant is entitled to recover the sum which complainant overpaid defendant as a consequence of such mistake.

It is true, as stated in the Chancellor's opinion, that "money paid under a mistake of fact may sometimes be recovered in an action in the nature of assumpsit." (2 Pom. Eq. Juris. (4 Ed.), Sec. 869).

And this is true where the mistake is mutual. "If a party innocently misrepresents a material fact by mistake upon which another party is induced to act, it is as conclusive a ground for relief in equity as a wilful and false assertion; for in either case it operates as a surprise and imposition on the other party. In such case the party must answer for his misrepresentations, even though innocently made." L. & N. Railroad Co. v. McKay and Morgan, 133 Tenn., 503, 507, 182 S. W., 585. See also, Bankhead v. Alloway, 6 Cold., 56, 75; Phillips v. Hollister, 2 Cold., 269, 277; Lewis v. McLemore, 10 Yerg., 206, 208; Walker v. Dunlop, 5 Hayw., 271, 275; 21 R. C. L., p. 167, Sec. 196.

The Chancellor further held that "money paid under mistake of fact may be recovered where the mistake could not have been reasonably avoided had the complaining party exercised reasonable caution and that due diligence that an ordinary and prudent (ordinarily prudent) business man would naturally exercise."

In the application of the principle just stated to the facts of this case, the Chancellor held, in substance and effect, that complainant was guilty of negligence which barred his recovery, in that, he voluntarily paid the money rentals without making an inspection and (if the shortage could not have been otherwise detected) a survey to ascertain whether the leased tract contained the number of acres called for in the lease.

The payments involved in this case were not "voluntary" in the sense of the law which precludes the recovery of "voluntary payments," because they were not made with "a full knowledge of all the facts which rendered the demand illegal." 21 R. C. L., pp. 141-143, Secs. 165-167, and page 166, Sec. 192; Baltimore, etc., Railroad Co. v. Faunce (Md.), 46 Am. D., 655, 656.

Neither do we think that complainant was guilty of negligence which should preclude a recovery. On this subject, in 2 Pom. Eq. Juris. (4 Ed.), Sec. 856, it is said:

"There are two requisites essential to the exercise of the equitable jurisdiction in giving any relief defensive or affirmative. The fact concerning which the mistake is made must be material to the transaction, affecting its substance, and not merely its incidents; and the mistake itself must be so important that it determines the conduct of the mistaken party or parties. If a mistake is made by one or both parties in reference to some fact which, though connected with the transaction, is merely incidental, and not a part of the very

subject-matter, or essential to any of its terms, or if the complaining party fails to show that his conduct was in reality determined by it, in either case the mistake will not be ground for any relief affirmative or defensive. As a second requisite, it has sometimes been said in very general terms that a mistake resulting from the complaining party's own negligence will never be relieved. This proposition is not sustained by the authorities. It would be more accurate to say that where the mistake is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be a violation of legal duty, a court of equity will not interpose its relief; but even with this more guarded mode of statement, each instance of negligence must depend to a great extent upon its own circumstances. It is not every negligence that will stay the hand of the court. The conclusion from the best authorities seems to be, that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded. Even a clearly established negligence may not of itself be a sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby. In addition to the two foregoing requisites, it has been said equity would never give any relief from a mistake, if the party could by reasonable diligence have ascertained the real facts; nor where the means of information are open to both parties and no confidence is reposed; nor unless the other party was under some obligation to disclose the facts known to himself, and concealed them. A moment's reflection will clearly show that these rules cannot possibly apply to all instances of mistake, and furnish the prerequisite for all species of relief. Their operation is, indeed, quite narrow; it is confined to the single relief of cancellation, and even then it is restricted to certain special kinds of agreements.'' (This section was approved in its entirety in the case of Dixon v. Morgan, 154 Tenn., 389, 402, 285 S. W., 558).

Pertinent statements in 21 Ruling Case Law are as follows:

"Though the rule was originally subject to the limitation that it must be shown that the party seeking to recover back had been guilty of no negligence, it is now held that the plaintiff in such case is not precluded from recovery by laches in not availing himself of the means of knowledge in his power." (Page 168, Sec. 196).

"The rule which formerly prevailed that if a person might, by the exercise of reasonable diligence, have ascertained the facts, he would not on the ground of ignorance or mistake be

permitted to recover money paid, has of late been much relaxed. The later cases establish the doctrine that it is not sufficient to preclude a person from recovering money paid by him under a mistake of fact that he had the means of knowledge of the fact. . . . The position that a person making a payment is precluded from recovery on the ground of mistake if he has the means of knowledge in his power is founded on the doctrine in an early English case, and being a part of a rule stated, it has, like so many other misstatements of legal principle, been copied by courts without a careful consideration of its import." (Pages 168-169, Sec. 198).

For cases illustrating the application of the principles above stated, see Cardinal v. Hadley, 158 Mass., 352, 35 Am. St. R., 492; Long v. Athol, 196 Mass., 497, 17 L. R. A. (N. S.), 96, 99; Reggio v. Warren, 207 Mass., 525; 32 L. R. A. (N. S.), 340, 343; Kingston Bank v. Eltinge, 40 N. Y., 391, 100 Am. D., 516, 518; Appleton Bank v. McGilvray, 64 Am. D., 92, 94, and Note, page 95; Bank v. Bank, 55 N. Y., 211, 14 Am. R., 232, 236.

We are of the opinion that, upon the facts of this record, complainant was not, as a condition of recovery of the overpayments sued for, onerated with the duty of ascertaining for himself the number of acres in the leased tract, and that the Chancellor erred in denying him a recovery and dismissing his bill. The complainant's first, second, fifth and seventh assignments of error are sustained. The decree of the chancery court is reversed, and a decree will be entered here granting complainant a recovery against defendant, E. D. Marcum for $476, with interest from the date of the filing of the original bill in this case, viz.: December 4, 1923, and for the costs of the cause in the chancery court and in this court.

Crownover and DeWitt, JJ., concur.